Kim L. **PERKINS**, Plaintiff,

v.

**US AIRWAYS, INC.**, Defendant.

No. 97–301–CIV–T–25C.

United States District Court,
M.D. Florida,
Tampa Division.

April 16, 1998.

Theodore Emanuel Karatinos, Seeley & Karatinos, P.A., St. Petersburg, FL, for Kim L. Perkins, plaintiff.

Peter W. Zinober, Zinober & McCrea, P.A., Tampa, FL, Tom A. Jerman, O'Melveny & Myers, LLP, Washington, DC, for U.S. Air, defendant.

## ORDER

SCRIVEN, United States Magistrate Judge.

THIS CAUSE is before the Court on the Defendant's Motion and Memorandum of Law in Support of Summary Judgment (Dkts. 25 and 26), Plaintiff's response (Dkt.37), and the exhibits filed in support of the parties' respective positions.[1]

### PROCEDURAL HISTORY

The Defendant, U.S. Airways, Inc., terminated the Plaintiff, Kim L. Perkins ("Perkins"), on November 22, 1996. Thereafter, Plaintiff initiated this action by filing an employment discrimination claim with the Equal

---

1. On March 17, 1998, the District Court referred Defendant's motion for summary judgment to the undersigned.

Employment Opportunity Commission (EEOC). Perkins alleges that he suffered disparate treatment as an employee of Defendant and was harassed due to his race, African–American. He also alleges that the Defendant terminated his employment because of his race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). Finally, Plaintiff alleges retaliatory discharge in violation of 42 U.S.C. § 2000e-3(a). The EEOC issued Plaintiff a notice of right to sue on January 2, 1997. (Dkt.1, Exh. A) Plaintiff filed this action on February 10, 1997.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Accelerated Trial Calendar Scheduling Order (the "Scheduling Order") entered in this case on September 8, 1997, Defendant filed a Motion and Memorandum for Summary Judgment on February 2, 1998. (Dkt.26) Plaintiff filed his response on February 23, 1998. (Dkt.37)

## STATEMENT OF THE FACTS

Defendant employed Plaintiff as a mechanic from 1989 to November 22, 1996. In March 1996, Plaintiff was transferred to the heavy maintenance department at the U.S. Airways facility in Tampa, Florida. Plaintiff alleges that from March 1996—until his termination in November 1996, he suffered disparate treatment and racial harassment. He further alleges that he filed two charges of discrimination with the EEOC and, as a result, Defendant terminated him. Defendant contends that it terminated Plaintiff after it conducted a thorough investigation and determined that Plaintiff attempted to steal company property—to wit, four or five packages of alkaline batteries—and engaged in acts of dishonesty and insubordination associated with the investigation of alleged attempted theft. It further alleges that when Plaintiff was disciplined or warned for improper performance, the discipline was justified and not related to Plaintiff's race. Finally, Defendant contends that Plaintiff's claim of racial harassment must fail as a matter of law because the incidents alleged by Plaintiff were not related to his race or were not sufficiently pervasive and severe to create a hostile work environment.

**2.** "PRC" is a sealant used in the maintenance department. Defendant concedes that it allows

I. Defendant's Statement of Facts as to the November 20, 1996 Alleged Attempted Theft

In support of its motion for summary judgment, Defendant made the following factual allegations with regard to the November 20, 1996 alleged attempted theft incident:

1. On November 20, 1996, between 12:00 and 12:30 a.m., an employee, John Ortega, saw Plaintiff enter a break room and place four to five boxes of "AA" batteries in his briefcase. (Dkt.42, p. 9)

2. At 2:00 a.m., a union steward informed Dave Schlidt, a foreman, that an employee had observed Plaintiff place boxes of batteries into his bag and that the employee suspected Plaintiff was attempting to steal them. Schlidt consulted with other Tampa management and decided to conduct a bag search of all employees exiting the building during the Plaintiff's shift change. (Dkt.29.¶ 4)

3. At 5:50 a.m., Schlidt positioned himself at the guard station of the hangar and searched bags of employees leaving for the day. (Dkt.29, ¶ 5)

4. Plaintiff exited at 6:45 a.m., but was not carrying a briefcase or bag. Plaintiff returned two minutes later and again attempted to exit the building, this time carrying his briefcase. Schlidt told the Plaintiff he needed to search his bag. Plaintiff said "Bullshit, you're not searching my bag." Plaintiff turned around and "bolted" toward the hangar. Schlidt followed Plaintiff. When Plaintiff entered the hangar, Scott Bartholomew, another foreman, was inside the hangar. Bartholomew observed Plaintiff walk rapidly into the hangar at approximately 6:45 a.m. Plaintiff approached a row of toolboxes, unzipped his briefcase and removed several boxes of batteries and placed them on top of the tool box. (Dkt.29, ¶ 5, 6)

5. When Schlidt entered the hangar, Bartholomew told Schlidt that he saw Plaintiff remove objects from his bag. Schlidt asked Plaintiff what he removed from his bag. Originally, Plaintiff denied removing anything but eventually Plaintiff stated he had removed "maybe some PRC [2] or something."

its employees to remove expired tubes of PRC from company premises.

Bartholomew retrieved the batteries while Schlidt spoke with Plaintiff. The batteries consisted of two boxes of "AA" two boxes of "AAA" batteries. (Dkt.29, ¶ 5, 6)

6. Thomas Derifield, the maintenance manager, called John Hedblom, the Labor Relations Director of Arbitration and Administration, and informed Hedblom that Plaintiff was suspected of stealing company-owned batteries. As a result, Hedblom traveled to Florida to investigate the situation. Hedblom interviewed Schlidt and Bartholomew and also received written statements from them. Hedblom also collected statements from Ira Highley, Tampa Stores Foreman, Ortega, and the security guard Stanley Peters. Highley stated that sometime during the first two hours of Plaintiff's shift, he saw Plaintiff in the stockroom where the batteries are kept sometime during the first two hours of Plaintiff's shift. Peters, who is not an employee of Defendant, confirmed that Plaintiff refused to allow Schlidt to inspect his bag and walked back into the hangar. According to Peters, when Plaintiff left the building later, he opened his briefcase for Peters to inspect. (Dkt.29, ¶¶ 3, 7)

7. At a meeting on November 21, 1996, Plaintiff, Hedblom, Derifield and two union representatives were present. Plaintiff denied that Schlidt asked him to search his bag upon his initial approach to exit the building. Plaintiff claimed, instead, that he turned back into the hangar to lock his toolbox. He denied any confrontation between him and Schlidt in the exit area and further denied placing any batteries in his bag. Plaintiff stated that on April 20, 1996 he put four "AA" batteries in his toolbox. Plaintiff did not inform Hedblom or Derifield of other witnesses. (Dkt.29, ¶ 8)

8. Hedblom obtained information regarding the location of the employees during the events and measured the distances to confirm that Bartholomew could have observed Plaintiff remove objects from his briefcase. Hedblom recommended to the maintenance department that Plaintiff be terminated. The decision to terminate Plaintiff was made in consultation with Hedblom, Derifield, Al Beamon (the Director of Heavy Maintenance), Carter Haigan, Tanya Sexton (an employee in Defendant's EEO office), and the legal department. Defendant determined that Plaintiff attempted to steal batteries and that statements Plaintiff made in connection with the incident and the subsequent investigation were not credible. Plaintiff was terminated for attempted theft, insubordination, and dishonesty. (Dkt.29, ¶¶ 9, 10)

9. Plaintiff's action of attempting to remove company batteries was in violation of Rule 32 which states:

> Dishonesty such as theft or pilferage of Company property, the property of our customers or property of employees, or the misappropriation of funds entrusted to employees, or misrepresentation to obtain employee benefits or privileges will be grounds for immediate dismissal and may where facts warrant, lead to prosecution to the fullest extent of the law.

(Dkt.29, ¶ 11, Exh. H)

10. Defendant has terminated white maintenance employees for removing or attempting to remove company property from the premises. (Dkt.29, ¶ 12)

11. It has not been Defendant's policy or practice to terminate either minority or non-minority employees for consuming aircraft food while on company premises or for performing g-jobs (non-company projects which employees perform, using company equipment). (Dkt.29, ¶ 13, Dkt.30, ¶ 7)

## II. Plaintiff's Statement of Facts as to the November 20, 1996 Alleged Attempted Theft

In opposition to the motion for summary judgment, Plaintiff made the following factual allegations with regard to the November 20, 1996 alleged attempted theft incident:

1. On November 20, 1996, Plaintiff was rushing to leave work when he realized he had forgotten to lock his toolbox. He went back into the hangar and locked his toolbox. Upon exiting the hangar, Schlidt and Bartholomew stopped Plaintiff and demanded to search his briefcase. Plaintiff opened his briefcase for them to look. Bartholomew did not look in Plaintiff's bag. Plaintiff left the hangar. Plaintiff had never seen a bag search conducted at the Tampa hangar. No

union official was present during the bag search. (Dkt.40, ¶¶ 47–53)

2. On November 21, 1996, Derifield accused Plaintiff of stealing and suspended him. (Dkt.40, ¶ 54)

3. On November 22, 1996, Derifield discharged Plaintiff from employment for allegedly stealing property. (Dkt.40, ¶ 58)

4. Bob Gardner, a mechanic, who was standing in the hangar twenty feet away from Plaintiff and had a clear view of Plaintiff, did not see Plaintiff do anything other than put his briefcase down while he locked his toolbox. Defendant did not interview Gardner prior to terminating Plaintiff. (Dkt.43, pp. 11–13)

5. Defendant did not terminate white employees for stealing. For instance, white mechanics have not been terminated or disciplined for stealing company sheet metal to enhance their toolboxes. Further, white mechanics have not been terminated for doing g-jobs, or using company material to repair or improve their personal equipment. Additionally, white mechanics and foremen have not been terminated for eating company snacks. White company mechanics have not been terminated for leaving their jobs to get fast food without clocking out.

6. Derifield issued a memo to all Tampa personnel on April 29, 1996 which stated:

Effective immediately, anyone caught removing supplies from an aircraft will be subject to disciplinary action, up to and including termination. This is a system-wide problem and it has to be addressed. It is getting out of hand and needs to be halted immediately. Thank you for your cooperation.

This policy was specifically addressed to the problem of pilferage of food and other supplies from airplanes.

III. Plaintiff's Statement of Facts as to Other Incidents and Occurrences

The Plaintiff made the following factual allegations as to incidents and occurrences other than the November 20, 1996 incident:

1. Before he was transferred to Tampa, James Ward, Plaintiff's future supervisor in Tampa, called Plaintiff a "troublemaker." (Dkt. 41. p. 40; Dkt. 43, p. 30)

2. Plaintiff filed a formal charge of discrimination against Defendant with the EEOC on April 5, 1996. Prior to this charge, other black employees in Tampa had filed EEOC charges. (Dkt.40, ¶ 5)

3. Tom Derifield told the supervisor of Kevin White, another black employee who was on light duty, to "Make sure you put that n_____ back to work." Derifield also said, referring to White, that he was "going to get that arrogant n_____." (Dkt.48, pp. 126, 143)

4. In May 1996, Ed Paice, a white employee, said to Patrick Steele, a black employee, "All I can see on company I.D. is your eyes and your teeth." Plaintiff was offended by the remark and reported it to a white foreman, Don Johnson. (Dkt. 28, Exh. A, p. 378; Dkt. 43, p. 24)

5. On May 13, 1996, Denny Gardner, a white employee, placed a scrub bucket and a cloth with toxic fluid on Plaintiff's toolbox to make him look bad. When Plaintiff asked Gardner about the incident, Gardner told him that a supervisor told Gardner not to discuss the incident. (Dkt.28, Exh. A, p. 355)

6. Another black employee who complained of discriminatory treatment found banana peels in his lunch box and his coat was dipped in hydraulic fuel. (Wright Deposition, p. 244)

7. On July 2, 1996, James Ward accused Plaintiff of mishandling a job. He threatened to issue a performance warning, but it was not issued. At his deposition Plaintiff was presented with a signed copy of the warning. (Dkt.40, ¶¶ 15–18)

8. Plaintiff filed another EEOC charge on July 9, 1996. (Dkt.40, ¶ 20)

9. On July 16, 1996, Ward issued Plaintiff a Unsatisfactory Report for purportedly losing or breaking nut plates on the wing-flap of an aircraft. None of the other mechanics who were assigned to the plane were issued unsatisfactory reports. Plaintiff was not working on that section of the aircraft and was not responsible for the maintenance. Two other mechanics, Edwin Joseph and Chris Zeller, wrote statements challenging the performance report issued to Plaintiff. Zeller, a white mechanics, was responsible for working on that section of the plane and

was not disciplined. (Dkt. 40, ¶¶ 27–31; Dkt. 46, p. 16) It was not until August 14, 1996 that Beamon directed that the unsatisfactory performance report be removed from Plaintiff's file. (Dkt.40, ¶ 33)

10. On July 22, 1996, Buddy Sharp accused Plaintiff of sabotaging an airplane. Sharp assaulted Plaintiff by putting a screwdriver in his face. Plaintiff reported the incident to Derifield, Beamon and Haigan. Defendant did not conduct a proper investigation of the matter. Ward issued Plaintiff a disciplinary warning on July 27, 1996, but did not terminate Sharp. Sharp was seen after the incident fighting with another white employee, but neither were disciplined. Additionally, two other white employees were not disciplined for fighting. (Dkt. 40, ¶¶ 27–31; Dkt. 47, p. 183)

11. Plaintiff complained of the incidents in a letter to Defendant's President dated August 6, 1996. (Dkt.40, ¶ 32)

12. In October 1996, Schlidt told Plaintiff he would be watching him because he was a known "troublemaker." (Dkt.40, ¶ 34)

13. On October 8, 1996 Plaintiff telephoned Haigan, and Beamon and left messages regarding incidents of racial harassment. On November 4, 1996 Plaintiff attempted to phone Sexton to report incidents, but she would not accept his call. (Dkt.40, ¶¶ 35–36, 38)

14. In November 1996, Dave Hildoer, a white employee, commented to Plaintiff that several black employees had filed lawsuits against Defendant and that the only thing black employee wanted to do was file lawsuits. Plaintiff reported this comment to a foreman, Bob Gomez. Later, someone hung an article relating to a race discrimination lawsuit brought by black employees against Defendant on the bulletin board in the hangar. (Dkt.40, ¶¶ 42–43)

15. Also in November 1996, a white employee, Ken Kitchen, made a racist doll from clay. The doll had gray skin, steel wool for hair, flashlight bulbs for eyes and an exaggerated nose and lips. Kitchen placed the doll on top of his toolbox next to the time clock for everyone to see. While members of management passed by the doll everyday, they did not remove the doll. Employees placed the doll on the toolbox of Noble Carter, a black employee. Carter became tired of people placing the doll on his toolbox and laughing at it, so he eventually threw the doll in the garbage. (Dkt. 47, pp. 244–45; Dkt. 49, pp. 126–27)

16. On November 5, 1996, Ed Paice held out a bag of burnt popcorn and said to Plaintiff, "Hey Kim, Black is beautiful." Plaintiff reported the comment to management. After he reported the incident, Plaintiff's supervisor told Plaintiff that the "guys" would be "gunning for him." Later that day, Plaintiff found on his toolbox a note that said "Watch ya ass." (Dkt. 28, Exh. A, p. 375; Dkt. 40, ¶ 39; Dkt. 47, p. 180)

17. On November 13, 1996, Derifield ordered Gomez to issue Plaintiff a verbal warning for missing nine days of work in the past year. Plaintiff had medical authorization to take sick leave because of his diabetic condition. (Dkt.40, ¶¶ 45–46)

18. On November 20, 1996, Plaintiff found a note taped to his box which said "IF YOU CAN'T RUN WITH THE BIG DOG, STAY ON THE PORCH!" Plaintiff reported this note to Derifield, Haigan and Hedblom. (Dkt.40, ¶¶ 54–55)

19. Another black employee, Patrick Steele, received a note which stated that his "black ass should have been fired." (Dkt.41, pp. 7–8)

20. The bathrooms walls had pictures of black faces and racial comments were written on the walls. One such comment said "There will always be problems until those n_____ are gone." (Dkt.47, p. 184)

21. White employees have stated that "the blacks there have caused a lot of the problems that are going on in Tampa[ ]." (Dkt.41, p. 36)

## IV. Defendant's Statement of Facts as to Other Incidents and Occurrences

The Defendant made the following factual allegations as to incidents and occurrences other than the November 20, 1996 incident:

1. It was not until after the filing of this action that Defendant learned of Edward Paice's comment to Patrick Steele that all he could see on his employee identification

badge was Steele's eye and teeth. (Dkt.30, ¶ 14)

2. In response to Plaintiff's complaint relating to the written warning for failing to replace nut plates on a wing flap of an airplane, Derifield conducted an investigation. Derifield concluded that Zellers had been assigned to that section of the airplane but that the failure to complete the repairs was due to a scheduling error by management. The written warning was removed from Plaintiff's file and sometime later, Beamon informed Plaintiff of same in writing. Derifield issued a written reprimand to foreman Ward for failing to conduct a thorough investigation before issuing discipline. (Dkt.30, ¶ 8)

3. Plaintiff and Sharp were *both* given written warnings for being disruptive in the workplace. Plaintiff complained to Derifield that Sharp initiated the confrontation. Derifield investigated the incident and obtained statements from eleven employees and concluded that there was no evidence to support Plaintiff's claim that Sharp was entirely at fault. (Dkt.30, ¶ 10)

4. Paice was disciplined for the "Black is beautiful" remark. (Dkt.30, ¶ 13)

5. Plaintiff did not report the "Watch ya ass" note until after his termination. (Dkt.30, ¶ 12)

6. The verbal warning by Gomez for attendance was warranted because Defendant's policy is to issue a verbal warning where an employee misses nine days within an eight-mont period. (Dkt.30, ¶ 9)

7. The note on Plaintiff's toolbox stated: IF ~~YOU~~ JIM CAN'T RUN WITH THE BIG ~~DOG~~ BYRD, STAY ~~ON~~ IN THE ~~PORCH~~ TREE." An investigation by Defendant determined that an employee had mistakenly placed the note on Plaintiff's toolbox. The note was intended for an employee named Jim. The note was intended to tease him about having too much to drink during a social outing and not being able to drink as much as an employee named Byrd. (Dkt.30, ¶ 11)

## SUMMARY JUDGMENT STANDARD

Against these facts, the Defendant seeks summary judgment as to all counts of Plaintiff's complaint. A motion for summary judgment, however, may only be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 324–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case as to which the nonmoving party has the burden of proof." *Cornelius v. Town of Highland Lake,* 880 F.2d 348, 351 (11th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). Mere allegations of denial are insufficient to meet the burden of opposing summary judgment, and the party resisting summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Finally, the relevant rules of substantive law dictate the materiality of a disputed fact. Thus, the decision on summary judgment in this case must be made with reference to the standard of proof applicable in the claim or claims against which the motion is brought. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1527–28 (11th Cir.1987).

Because, the Court finds material disputes of fact as to central issues going to each of the Plaintiffs claims, it finds that summary judgment is inappropriate in this case. Each claim is addressed in turn.

## DISCUSSION

### I. Racially Hostile Work Environment

In order to establish a prima facie case of racial harassment, Plaintiff must show: 1) he is a member of a protected class; 2) he was subjected to unwelcome harass-

ment; 3) the harassment was based on his race; 4) the harassment was sufficiently severe or pervasive to alter Plaintiff's conditions of employment and create an abusive working environment; and 5) the company knew or should have known of the harassment and failed to take remedial action. *Armstead v. City of St. Petersburg*, Case No. 95–1548, 1997 WL 724420, *5 (M.D.Fla. Nov. 13, 1997); *Dudley v. Wal–Mart Stores, Inc.*, 931 F.Supp. 773 (M.D.Ala.1996). In order to prove the second element, unwelcome harassment, Plaintiff must show that he neither "solicit[ed] nor incite[d] it, and ... that [he] regarded the conduct as undesirable or offensive." *Bivins v. Jeffers Vet Supply*, 873 F.Supp. 1500, 1507 (M.D.Ala.1994), *aff'd*, 58 F.3d 640 (11th Cir.1995) (citation omitted). As to the fourth requirement, in determining whether the harassment was severe or pervasive enough to adversely affect a reasonable employee, the finder of fact examines "not only the frequency of the incidents, but the gravity of the incidents as well." *Vance v. Southern Bell*, 863 F.2d 1503, 1511 (11th Cir.1989). Thus, the severity of the harassment is determined by the totality of the circumstances. *Id.* Isolated and sporadic incidents are insufficient to show a hostile work environment. *Dudley, supra*, at 791.

 Plaintiff has demonstrated a prima facie case of a racially hostile work environment. It is undisputed that he is a member of a protected class. Further, Plaintiff has presented sufficient evidence which, if believed, would allow a trier of fact to reasonably conclude he was subjected to uninvited, unwelcome, harassment and that such harassment was based on his race.

First, there is evidence that employees of Defendant made numerous racial comments to Plaintiff as well as other black employees and that the comments offended Plaintiff. *See* pp. 7–10, *supra.* It does not matter that all of the remarks were not directed at Plaintiff as the trier of fact can consider evidence of discriminatory acts at the Tampa facility directed at employees other than Plaintiff which tend to show racial animus. *See Vance, supra*, at 1511 n. 5. Further, there is evidence that the bathroom walls contained racial slurs and pictures. (Dkt.47, p. 184) There is also evidence that a newspaper article relating to a lawsuit against Defendant

brought by other black employees was hung in the break room. (Dkt.40, ¶¶ 42–43) Finally, Plaintiff has submitted evidence that one white employee made a clay doll having racial overtones which was left by the time clock and not removed by management, and that another black employee found banana peels in his toolbox and his coat was soaked in hydraulic fuel. Viewing this evidence in the light most favorable to Plaintiff, there is sufficient evidence to find pervasive unwelcome harassment on the basis of Plaintiff's race. *See Coney v. Department of Human Resources of State of Ga.*, 787 F.Supp. 1434, 1443 (M.D.Ga.1992) (sufficient evidence of unwelcome harassment where evidence that wrenches thrown at plaintiff, plaintiff's tires punctured, picture of lynching left on plaintiff's desk, threats, and racial slurs and jokes).

As for the fourth element, Plaintiff claims that as a result of the harassment, he was eventually terminated. There is, therefore, evidence to support an inference that the alleged harassment altered the conditions of Plaintiff's employment and created an abusive work environment. *Id.* Plaintiff has presented evidence that he perceived his work environment as hostile and abusive. Further, in view of the evidence presented, a jury could reasonably find that such a perception is reasonable. *See e.g. Watkins v. Bowden*, 105 F.3d 1344, 1355 n. 20 (11th Cir.1997) ("[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive ..., there is no need for it also to be psychologically injurious.") (citation omitted).

Finally, there is sufficient evidence which, if true, would support a finding that Defendant knew or should have known of the harassment and failed to take prompt remedial action. Plaintiff has presented evidence that he complained of the incidents to various persons, including his supervisors, the President of the company and other management. (Dkt. 20, Exh. A, p. 378; Dkt. 40, ¶¶ 32, 35–36, 38–39, 54–55) While Defendant contends that Plaintiff did not report at least some of the incidents, the Court must view the evidence in the light most favorable to Plaintiff. Further, while Defendant has submitted evi-

dence that it disciplined Paice for making his "Black is beautiful" comment, Plaintiff has submitted evidence that no one was disciplined for all of the other occurrences.

In light of the foregoing, Plaintiff has demonstrated that there are genuine issues of material facts relating to his claim of a racially hostile work environment. The Court notes that Plaintiff's claim turns largely on the credibility of witnesses. Credibility determinations are, of course, determinations to be made by the jury, *Armstead, supra,* 1997 WL 724420 at *6. Thus, summary judgment on this issue is denied.

## II. Disparate Treatment and Discriminatory Discharge on the Basis of Race

■ Plaintiff's complaint also contains claims of disparate treatment and discriminatory discharge on the basis of race. The Plaintiff can demonstrate a prima facie case of discrimination by circumstantial evidence of discriminatory intent. *Jones v. Bessemer Carraway Med. Center,* 137 F.3d 1306, 1310 (11th Cir.1998). Under the burden shifting analysis set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), Plaintiff has the burden of demonstrating a prima facie case of race discrimination. After a prima facie case is demonstrated, the Defendant has the burden of articulating a legitimate, non-discriminatory reason for the adverse employment action. *Jones,* at 1310. Plaintiff then has the burden of showing that the proffered reasons are mere pretext for discrimination. *Id.*

Plaintiff can demonstrate a prima facie case of discriminatory discharge by showing: 1) he is a member of a protected group; 2) he was subjected to an adverse employment action; 3) Defendant treated similarly situated employees who are not members of a protected group more favorably; and 4) Plaintiff was qualified to do his job. *Id.* at 1310–11. The elements necessary to demonstrate a prima facie case of disparate treatment are the same except that Plaintiff also must also show that "sufficient evidence exists, either direct or circumstantial, to infer a nexus or causal connection between race and disparate treatment." *Armstead, supra,* 1997 WL 724420 at *2.

## A. Plaintiff's Claim of Discriminatory Discharge

■ There does not appear to be a dispute that Plaintiff has met three of the elements of a prima facie case of discriminatory discharge. Specifically, Plaintiff has demonstrated the following: 1) Plaintiff is a member of a protected class; 2) Plaintiff suffered an adverse employment action—termination; and 3) Plaintiff was qualified to work as a mechanic—a job he held for approximately seven years. Defendant, however, disputes whether Plaintiff has submitted evidence demonstrating the that Defendant treated "similarly situated" employees more favorably. Defendant contends that the employees with whom Plaintiff compares himself— white mechanics who took or used company material to enhance personal items, who ate plane food, or who took company time for personal reasons without reporting it—are not "similarly situated" vis-a-vis Plaintiff because they did not remove items from company property and because the items in question are sufficiently dissimilar that a claim of disparate treatment does not lie.

■ The burden is on the Plaintiff to show that other employees are "similarly situated." *See Jones,* 874 F.2d at 1541. In determining whether employees are similarly situated, "it is necessary to consider whether the employees are involved in or accused or the same or similar conduct and disciplined in different ways." *Jones,* supra, at 1311 (citation omitted). Most important are the nature of offenses and disciplinary actions taken. *Id.* Thus, the determination of whether employees are similarly situated is "factually intensive." *Naylor v. Georgia–Pacific Corp.,* 875 F.Supp. 564, 577 (N.D.Iowa 1995).

After reviewing the evidence, this Court finds that there are genuine issues of material fact remaining as to the following issues: 1) whether Plaintiff and the white mechanics he compares himself to are "similarly situated;" and 2) whether Plaintiff, who was terminated for his alleged action, was subjected to harsher treatment than "similarly situated"

white employees. The evidence which supports this finding is as follows:

First, according to Defendant's maintenance department's written policy, "theft" or "pilferage" is grounds for immediate dismissal. (Dkt.29, ¶ 11, Exh. H) Plaintiff has presented evidence that when white mechanics used company sheet metal to enlarge the holding capacities of the employees' personal toolboxes, consumed company meals and snacks, performed g-jobs on company time and utilized company material to perform the jobs, and went on fast food runs without clocking out, they were neither disciplined nor terminated. (Dkt. 40, ¶¶ 59–63; Dkt. 42, p. 24–25; Dkt. 43, p. 29)

Second, Plaintiff has submitted evidence that, if believed, contradicts Defendant's claim that it had a policy of not terminating any employee, regardless of race, for consuming company food on the premises, performing g-jobs, and using company equipment. For instance, Plaintiff presented testimony of one of Defendant's employees who stated that employees "run the risk of losing their job [sic] if they get caught [using company material to perform g-jobs]." (Dkt.42, p. 23) Additionally, another employee testified that employees were not allowed to eat airplane food. (Dkt.43, p. 13)

Third, even if the trier of fact believes that Defendant had a policy of terminating only those employees who removed company property from the premises, Plaintiff has submitted evidence which would support a finding that he and the white mechanics he compares himself to are "similarly situated" in this regard. For instance, there is evidence that white employees utilized company materials onsite on personal items such as lawn mowers, boats, motorcycles and models. Presumably, these personal items were eventually brought back to their respective homes along with the company property. And, of course, food consumed would naturally be removed from the premises by the person who consumed it.

### B. Plaintiff's Claim of Disparate Treatment Relating to Other Disciplinary Actions

As to the other alleged instances of disparate treatment relating to Defendant's discipline of Plaintiff, Defendant argues that they do not show any discriminatory intent because "non-discriminatory differences just as readily explain the difference in treatment." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1186 (11th Cir. 1984). Defendant contends that it treated Plaintiff no differently than "similarly situated" employees. Plaintiff, however, has provided sufficient evidence for a jury to infer a causal connection between Plaintiff's race and the disparate treatment. For instance, Plaintiff has produced evidence that his supervisor, who called Plaintiff a "troublemaker," issued Plaintiff a warning for poor workmanship. The other mechanics assigned to work on the airplane, however, were not issued unsatisfactory reports. Additionally, the white mechanic who was responsible for the workmanship was not disciplined. (Dkt. 40, ¶¶ 27–31; Dkt. 46, p. 16) Further, Plaintiff has produced evidence that he was disciplined for fighting, but white employees were not disciplined for fighting. (Dkt.47, p. 183) While Defendant has offered evidence supporting its claims that the discipline was warranted and was not discriminatory, this Court must view the evidence in the light most favorable to Plaintiff. As such, the Court finds that the Plaintiffs evidence supports a prima facie case of disparate treatment. Thus, the Court turns to Defendant's proffered reasons for its actions.

### C. Defendant's Reasons for Employment Actions

Defendant has provided three reasons for terminating Plaintiff. These reasons are as follows: 1) Plaintiff attempted to steal four packages of batteries that were Defendant's property; 2) Plaintiff was insubordinate in refusing to show his foreman the contents of his briefcase; and 3) Plaintiff made untruthful statements relating to the alleged attempted theft and subsequent investigation including: a) that he did not place the batteries in his briefcase; b) that Schlidt never asked him to open his briefcase; and c) that he put four "AA" batteries in his toolbox on November 20. As to Plaintiffs' disciplinary warnings, Defendant contends that, with the exception of the poor performance warning relating to the nut bolts which were removed from Plaintiff's file, they were deserved. These reasons, if believed, are sufficient to

meet Defendant's burden. Thus, for purposes of summary judgment, Defendant has proffered non-discriminatory reasons for the actions, and, therefore, the burden shifts back to Plaintiff to show pretext.

### D. Evidence of Pretext

■ In the typical case, for purposes of demonstrating pretext, the plaintiff concedes the actual occurrence of the events advanced by the defendant which were the alleged bases for the adverse employment action. In this case, however, Plaintiff alleges that Defendant's proffered reasons for Plaintiff s termination are subterfuge and, further, maintains that the events, as alleged by Defendant, did not occur. Plaintiff's attack either goes to the issue of whether Defendant's proffered reasons are "legitimate" or to the ultimate issue of pretext. In any event, as demonstrated below, there are factual issues remaining precluding summary judgment.

■ Defendant correctly states the law that "[i]f an employer discharges an employee because it honestly believed that the employee had violated a company policy, even if the employer's belief was mistaken, the discharge is not 'because of race' and the employer has not violated the law." *See Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1453 (11th Cir.1987); *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir.1989) ("even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.") (citations omitted). Nonetheless,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination . . .

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (footnote omitted).

Plaintiff has presented evidence which, if believed, would allow a reasonable jury to disbelieve Defendant's contention that it terminated Plaintiff because Defendant "honestly believed" that Plaintiff attempted to steal batteries, was insubordinate and lied. First, there is evidence that Derifield, who participated in the decision to terminate Plaintiff, used a racial epithet on several occasions when referring to another black employee. (Dkt.48, pp. 126, 143) This evidence, while not direct evidence of discrimination, "may be significant evidence of pretext once a plaintiff has set out the prima facie case." *See Jones, supra* at 1313. Second, there is evidence that Plaintiff's supervisor considered him a "troublemaker." (Dkt. 41, p. 40; Dkt. 43, p. 30) Third, Plaintiff has presented various pieces of evidence of pretext as to Defendant's allegation that it honestly believed it attempted to steal batteries.

With regard to this, Plaintiff offers conflicting statements relating to whether the batteries Plaintiff allegedly attempted to steal were all "AA" batteries or whether the batteries were both "AA" and "AAA." For example, Ortega testified that he was positive that the batteries Plaintiff placed in his bag were "AA" batteries. (Dkt.42, p. 19) The batteries, however, that were allegedly found on Plaintiff's toolbox were both "AA" and "AAA" batteries. (Dkt.30, ¶ 6) Additionally, each of the "witnesses" to the event had been told of Ortega's statement before they allegedly observed the Plaintiffs actions. As such, it is possible that their alleged eyewitness accounts were tainted by Ortega's statement before they "saw" what they allegedly saw. Also, the batteries were *not* found in Plaintiff's possession. (Dkt.29, pp. 5, 6) Finally, one witness to the incident, who was not interviewed by Defendant, stated that Plaintiff only locked his toolbox and left the hangar. (Dkt.43, pp. 11–13)

Fourth, Plaintiff also presented evidence contradicting Defendant's claim that Plaintiff was terminated for being "insubordinate" in refusing to allow his supervisor to look in his bag. Plaintiff states in his affidavit that when Schlidt and Bartholomew demanded to search his briefcase, he opened it for them to look inside. (Dkt.40, pp. 49–50) Further, there is evidence that Defendant had never before conducted a bag search and that the

search was conducted in violation of the collective bargaining agreement as no union official was present. (Dkt.40, ¶ 47–53) As such, Plaintiff has presented sufficient evidence which would allow the trier of fact to reject Defendant's claim that Plaintiff was fired due to its "good faith belief" that Plaintiff was "insubordinate."

Finally, Plaintiff has presented evidence which is contrary to Defendant's claim that Plaintiff was terminated for making false statements. Plaintiff has presented evidence that he did not attempt to steal the batteries and did open his bag for Schlidt and Bartholomew to look inside when initially required. Further, at his deposition, Plaintiff denied making a statement that he had placed batteries in his toolbox. He explained that he tried to get batteries on that day for his flashlight but that there were not any in stock. (Dkt.28, Exh. A, p. 607)

Accordingly, as there are genuine issues of material fact remaining, Defendant's motion for summary judgment as it relates to Plaintiff's claim of disparate treatment and discriminatory discharge is denied.

## III. Retaliatory Discharge

■ Plaintiff's complaint also contains a claim of retaliatory discharge. To demonstrate a prima facie case of retaliation, Plaintiff must show the following: 1) a statutorily protected expression; 2) an adverse employment action; 3) a causal link between protected expression and adverse action. *Armstead, supra,* at *4. If Plaintiff demonstrates a prima facie case of retaliation, the burden shifting framework from *McDonnell Douglas* applies and the burden of production is then shifted to Defendant. *Id.* Again, the Defendant need only provide a legitimate, non-discriminatory reason for the adverse employment action, then the burden shifts back to Plaintiff to show pretext. *Id.* Each element of the prima facie case will be addressed in turn.

### A. Statutorily Protected Expression

■ Plaintiff has presented evidence that he engaged in a protected activity. Specifically, Plaintiff testified that he made internal complaints of racial harassment and discriminatory treatment. *See Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 n. 11 (11th Cir.1993) (conversation relating to complaint of discrimination is a protected expression); *Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1500 (11th Cir.1990) (employee complained of discrimination in letter to vice president of company). Further, there is evidence that Plaintiff filed two EEOC charges during his tenure at Tampa facility. *See Eldridge v. Morrison,* 970 F.Supp. 928 (M.D.Ala.1996), *aff'd,* 120 F.3d 275 (11th Cir.1997) (where Plaintiff filed EEOC charge he met the first requirement); *Thurman v. Robertshaw Control Co.* 869 F.Supp. 934, 941 (N.D.Ga.1994) ("[i]t is clear that plaintiff's wife engaged in statutorily protected expression in filing her EEOC charge.") Thus, Plaintiff has shown sufficient evidence to satisfy the first requirement.

### B. Adverse Employment Action

Plaintiff has also met the second requirement of a prima facie case. Plaintiff has presented evidence that he was given disciplinary warnings and eventually was terminated. *See Resley v.* Ritz–Carlton Hotel Co., 989 F.Supp. 1442, 1447 (M.D.Fla.1997) (where plaintiff alleged she was terminated by defendant, plaintiff met second prong).

### C. Causal Nexus

■ To satisfy the third element, a causal link, Plaintiff "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Holifield v. Reno,* 115 F.3d 1555, 1566 (11th Cir.1997) (citation omitted). In doing so, Plaintiff must establish that Defendant knew of Plaintiff's protected expressions at the time of the adverse actions. *Id.*

Plaintiff has submitted evidence that he was referred to as a "troublemaker" by his supervisor. (Dkt. 41, p. 40; Dkt. 43, p. 20) He also has submitted evidence that Plaintiff was issued a disciplinary warning one week after he filed an EEOC complaint. (Dkt.40, ¶ 20, 27–31) According to Plaintiff, he was issued a second disciplinary report eleven days later. (Dkt.40, ¶ 27–31) There is evidence that Schlidt told Plaintiff he would be watching him in October 1996 because he was a "troublemaker." (Dkt.40, ¶ 34) Finally, Plaintiff received a verbal warning re-

garding his absences approximately eight days after he reported an incident of racial harassment to management. (Dkt.40, ¶¶ 36, 45–46) Thus, Plaintiff has shown a sufficient causal connection. *See Armstead,* supra, at *4 ([t]he close proximity between Plaintiffs charge of discrimination and the subsequent disciplinary actions raises a prima facie issue of fact as to whether the disciplinary measures were wholly unrelated to the charge of discrimination.)

### D. Defendant's Rebuttal

As previously noted above, Defendant has proffered reasons for terminating Plaintiff. Specifically, Defendant contends that it terminated Plaintiff because he attempted to steal batteries, was insubordinate and lied. Further, Defendant contends that the disciplinary charges were warranted under Defendant's policies. These reasons, if believed, are sufficient to meet Defendant's burden. Thus, the burden shifts back to Plaintiff to show pretext.

### E. Pretext

 As previously addressed above, Plaintiff has submitted evidence, which if believed, would support a finding that Defendant's purported reasons for terminating Plaintiff were pretextual for retaliation. Thus, summary judgment on this claim is denied.

### PROCEDURAL ISSUES

Finally, Defendant raises two procedural issues relating to certain evidence submitted by the parties in support of their respective positions. These issues require only a brief discussion.

First, Defendant submitted a motion to strike the affidavit of Dr. Robert S. Kennedy, an expert in Human Factors, Human Performance, Vision and Visual Perception, which Plaintiff submitted in support of his response to the motion for summary judgment. (Dkts. 50 and 55) Dr. Kennedy states in his affidavit that he made a site visit to the maintenance hangar at which Plaintiff worked and made "illumination measures and measures of the linear extent of the distances between various positions." Dr. Kennedy apparently reviewed the testimony of John Ortega, Scott Bartholomew, and David Schlidt. With regard to Ortega, Dr. Kennedy states that at a distance of 35 feet, a box the size of the battery box, could be detectable but that one could not identify what it was nor the content. (Dkt.50, ¶ 6A) As to Bartholomew, Dr. Kennedy states that "attempting to identify a black box with white writing and to recognize that it is a box of batteries rather then [sic] a small book or some other object similarly colored at 35 feet would be very difficult and at 65 feet would be impossible." Kennedy concludes that it is possible that Bartholomew saw objects, but Kennedy did not believe that Bartholomew would have been able to recognize them. (Dkt.50, ¶ 6B) Finally, with regard to Schlidt, Kennedy states that his testimony suggests that he is not an eye witness. (Dkt.50, ¶ 6C)

Defendant objects to the affidavit and argues that it is not admissible under Rule 702, Fed.R.Evid., as it does not assist the trier of fact, and, as such, cannot be considered by the Court in its determination of the motion for summary judgment. Plaintiff responds that Defendant's motion is procedurally defective because an affidavit is not a pleading under Rule 12(f), Fed.R.Civ.P., and, alternatively, the motion was not filed within 20 days as required by Rule 12(f). Plaintiff further contends that Dr. Kennedy's testimony will assist the jury in determining whether the stated reason for firing Perkins was false and pretextual.

Defendant correctly points out that the Eleventh Circuit has looked unfavorably on testimony regarding eyewitness reliability.[3] *See United States v. Smith,* 122 F.3d 1355, 1357 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997) (and cases cited therein) (trial court did not abuse its discretion in excluding testimony of expert witness who proposed to testify that the eyewitness identification of a robbery suspect could be unreliable due to factors such as disguise, weapon focus, delay and

---

**3.** The Court would note that in support of its motion, the Defendant has proffered the testimony of Mr. Hedblom that he measured the distance and stated location of witness Scott Bartholomew and confirms Bartholomew's ability to observe Plaintiff remove the batteries from his bag and place them on his toolbox. (Dkt.29, ¶ 9)

stress). In fact, expert testimony regarding eyewitness reliability is inadmissible per se. *United States v. Holloway,* 971 F.2d 675, 679 (11th Cir.1992), *cert. denied,* 507 U.S. 962, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993) (court did not abuse its discretion in denying motion to admit testimony of expert in eye witness identification as such testimony is not admissible); *United States v. Benitez,* 741 F.2d 1312, 1315 (11th Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2679, 86 L.Ed.2d 698 (1985) (same). Instead, according to the Eleventh Circuit, issues relating to a witness' perception can be adequately addressed on cross-examination. *See Smith, supra,* at 1359. Nonetheless, these cases are factually distinguishable in that they all involved criminal actions. Further, the cases did not appear to involve the particular type of testimony at issue here. It also does not appear that the Eleventh Circuit has ruled on the issue of whether, in a civil action, an expert may testify regarding eyewitness perception in conjunction with lighting, distance and contrast of objects, as proposed here.

In any event, the Court finds that it need not reach the merits of Defendant's motion to strike. This is so because regardless of whether the Court considers the affidavit, there are still genuine issues of material fact precluding the entry of summary judgment. This Court recognizes that the admissibility of Dr. Kennedy's testimony may be an issue for trial. Thus, Defendant is free to raise the issue in a motion *in limine.*

As to the second procedural matter, in support of its motion for summary judgment, Defendant submitted a copy of the transcript from Plaintiff's arbitration hearing and the related determination of the arbitration panel that Defendant terminated Plaintiff for just cause. An arbitral decision may be admitted in a Title VII or 1983 action. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 60, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *McDonald v. City of West Branch, Mich.,* 466 U.S. 284, 292 n. 13, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984). Neither the Supreme Court nor the Eleventh Circuit has set standards as to the weight to be accorded such a decision. *Id.; Roadway Express, Inc. v. Brock,* 830 F.2d 179, 181 (11th Cir.1987). Certainly, such a decision is not binding on this Court as to any issue relating to discrimination addressed therein. *Alexander, supra.* The Court has reviewed the arbitration hearing transcript and finds that the testimony contained therein is merely further evidence that there are disputed genuine issues of material fact in this action precluding the entry of summary judgment.

## CONCLUSION

Based on the aforementioned facts and conclusions, the Court ORDERS that the Defendant's Motion for Summary Judgment (Dkt.25) is DENIED.